# In the United States Court of Federal Claims

No. 22-379C
(Filed Under Seal: July 18, 2022)
(Reissued: August 2, 2022)[*]

**FOR PUBLICATION**

****************************************
CGS-SSG JOINT VENTURE,

        Plaintiff,

v.

THE UNITED STATES,

        Defendant.
****************************************

*Robert Nichols*, Nichols Liu LLP, Washington, D.C., for Plaintiff. With him on briefs were *Andrew Victor* and *Madison Plummer*, Nichols Liu LLP.

*Joshua A. Mandlebaum*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for Defendant, United States. With him on briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *William J. Grimaldi*, Assistant Director, as well as *John W. Cox*, Attorney Advisor, Building & Acquisitions, Office of the Legal Advisor, United States Department of State.

## OPINION AND ORDER

Plaintiff CGS-SSG Joint Venture ("CGS-SSG") protests the government's rejection of its proposal for security services abroad. The parties have filed cross-motions for judgment on the administrative record, and I have heard oral argument.[1] For the reasons discussed below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**. The case is **DISMISSED**.

---

[*] Pursuant to the protective order in this case, the Court initially filed this opinion under seal on July 18, 2022, for the parties to propose redactions of confidential or proprietary information. The parties were directed to propose redactions by August 1, 2022. The parties notified the court on August 1 that there were no proposed redactions. The Court hereby releases publicly the opinion and order of July 18 in full.

[1] Pl.'s Mot. for J. on the Admin. Rec. (ECF 16) ("Pl.'s Mot."); Def.'s Cross-Mot. for J. on the Admin. Rec. & Resp. to Pl.'s Mot. for J. on the Admin. Rec. (ECF 20) ("Def.'s Cross-Mot. & Resp."); Pl.'s Reply & Resp. to Def.'s Cross-Mot. for J. on the Admin. Rec. (ECF 21) ("Pl.'s Reply & Resp."); Def.'s Reply in Supp. of Def.'s Cross-Mot. for J. on the Admin. Rec. (ECF 22) ("Def.'s Reply"); Hearing Tr. (ECF 27) ("Tr.").

## BACKGROUND

On May 5, 2021, the Department of State ("DoS") issued a request for proposals (No. 19AQMM21R0149, hereafter "RFP") seeking local guard force services at the U.S. Mission in Mbabane, Eswatini[2] for a one-year base period with four optional one-year extensions. Administrative Record ("AR") 340, 344. The proposals were to be evaluated on a "lowest price technically acceptable" basis, meaning that among proposals deemed acceptable on their technical merits, AR 450 § M.2.2, the final award would be made to the bid with the lowest evaluated price, AR 452 § M.3. CGS-SSG submitted a proposal, and DoS determined that it was technically acceptable. But DoS found that a different firm's proposal was at a lower price. AR 573–74.

### A. Relevant RFP Provisions

CGS-SSG's claim hinges on the RFP's requirements for presentation and evaluation of proposed pricing. The most significant provisions are as follows.

The RFP required presentation of pricing information on two tables. AR 423. Each proposal was to include, as Exhibit S, a pricing schedule with proposed rates for contract line items required by the RFP, the agency-designated estimated quantity of each item, and an "extended total" based on the product of those two values. AR 345–46, 423, 439, 636; *see also* AR 21. Proposals that failed to include rates and prices for all line items could be rejected. AR 449 § M.2.1. The sum of the extended totals, including the base contract year and all option years, was the "total ceiling price." AR 439 § L.11.1.2.

Proposals were also to include Exhibit M, the "Other Than Cost and Pricing Spreadsheet." AR 423, 440. In Exhibit M, the bidder would "depict the development of the labor rates proposed in [Exhibit S]" by breaking down allocations for fringe, overhead, and administrative costs, as well as profit margins. AR 439–40 § L.11.1.3; *see also* AR 27–28. The purpose of requiring such supplemental information, as the RFP explained, was to "establish compliance with the local labor laws" which might require, for example, the payment of bonuses, specific minimum wage levels, pensions, and health benefits. AR 439 § L.11.1.3.

The RFP bound firms to make a single offer in the required form. "Alternate offer[s]" were not acceptable. AR 436 § L.3. Neither were "[a]lternative pricing strategies." AR 449 § M.2.1.

The government's price evaluation of technically acceptable proposals was based on the total ceiling price, with two important qualifications. *See* AR 439 § L.11.1.2 ("The total proposed ceiling price shall be the price evaluated in accordance

---

[2] Eswatini was known as Swaziland before the country changed its name in 2018.

with Section M."), AR 449 § M.2.1 (providing that "the Government [would] evaluate proposals based on the total *evaluated* price to the Government, including options and any U.S. preference, but excluding VAT and DBA, if proposed") (emphasis added);[3] *see also* AR 450 § M.2.1.3.

First, the RFP provided a price preference for United States firms, under which the total ceiling price was reduced by 10 percent for evaluation purposes. AR 449 § M.2.1.2; *see* 22 U.S.C. § 4864. That meant (hypothetically) that if a United States firm proposed a total ceiling price of $1 million, the proposal would be evaluated as if it proposed a total ceiling price of $900,000.

Second, the RFP provided rules for comparing offers in different currencies. Foreign firms were required to bid in the local currency, Eswatini Lilangeni ("SZL"). AR 344 § B.3, AR 439 § L.11.1.2. United States firms had the option of submitting bids in SZL too. AR 439 § L.11.1.2 ("If a U.S. firm submits an offer in local currency and receives a subsequent contract award in local currency, the contract will remain in local currency."). But the RFP also permitted United States firms to submit proposals in United States dollars ("USD") where "bidding and being paid in [USD] is not in violation of any host country laws." AR441 § L.11.1.5; *see also* 22 U.S.C. § 4864(c)(4)(A).

Anticipating offers in both currencies, the RFP incorporated Federal Acquisition Regulation ("FAR") 52.225-17, which establishes an apples-to-apples comparison denominated in USD:

> If the Government receives offers in more than one currency, the Government will evaluate offers by converting the foreign currency to United States currency using the exchange rate used by the U.S. Embassy Mbabane, Eswatini in effect as follows:
>
> 1. On the date specified for receipt of offers, if award is based on initial offers; otherwise
>
> 2. On the date specified for receipt of proposal revisions.

AR 449 § M.2.1.1.

### B. Submission, Award, and Subsequent Proceedings

CGS-SSG's original proposal, on June 7, contained pricing in both USD and SZL. Exhibit S included only USD unit rates and extended totals. AR 21–26; *see also* AR 51 (representing that "bidding and being paid in U.S. dollars is not in violation of any host country laws"), AR 439 § L.11.1.2, AR 441 § L.11.1.5. The original Exhibit

---

[3] VAT designates Value Added Tax; DBA designates Defense Base Act Insurance. AR 348 §§ B.8.5–6.

M, in contrast, was priced only in SZL. AR 28–32. CGS-SSG's figures assumed an exchange rate of 1 SZL to 0.073962856 USD, the rate in effect between June 4–5 and acceptable at the time of the original proposal.[4] AR 560.

DoS requested revision and clarification of certain aspects of CGS-SSG's proposal. AR 334–35. One of its questions addressed the disconnect between USD and SZL pricing in the two exhibits:

> Exhibit M. Although local currency offers are accepted, CGS-SSG requested a USD offer, which is acceptable. For clarity and consistency, can CGS-SSG provide a USD Exhibit M?

AR 335. In a revised Exhibit M attached to its first final proposal revision, Plaintiff provided the USD equivalent to items formerly designated only in SZL, using the same exchange rate as before. AR 463–64.

Although DoS's request only addressed Exhibit M, CGS-SSG also amended the presentation of Exhibit S. In a revised Exhibit S, CGS-SSG continued to include unit rates and extended totals for each line item in USD. But it added — for each line item — a column of extended totals in SZL, based on the same exchange rate used in the initial offer. AR 468–72. The Exhibit S revisions did not add SZL unit rates for any line item. *Id.* CGS-SSG presented Exhibits S and M in the same way, still using the initial offer's exchange rate, in its second and third final proposal revisions. AR 506–07, 512–16, 532–33, 539–43. CGS-SSG did not expressly represent that it intended to offer in SZL.

The contracting officer interpreted CGS-SSG's offer as having been "proposed in both USD and local currency," AR 559, 568; *see also* AR 544 (noting that some offerors "proposed in both USD and local currency"); *but see* AR 559 (mentioning that another firm "was the only offeror that proposed in local currency"), AR 570 (same), and noted that CGS-SSG "requested to be paid in USD." AR 559. But the officer chose to disregard CGS-SSG's SZL figures because they were based on an outdated exchange rate:

> Although CGS-SSG did propose in both USD and local currency, the local currency offer provided by CGS-SSG is not a substantiated local currency offer. The exchange rate used by CGS-SSG to convert from USD to local currency had been in use for the initial offer, proposal revision 1, proposal revision 2, and proposal revision 3. The exchange rate that CGS-SSG has used on every price proposal is 1 SZL to

---

[4] CGS-SSG properly established its qualification for a 10 percent price preference as a United States firm. AR 18 § 2.1, AR 56–64 § 6.1.

> 0.073962856 USD. Looking at the SZL to USD currency exchange rates, this was the correct exchange rate between June 4 and June 5, which would be acceptable for the initial offer was due on June 7. The exchange rate on September 30 was 1 SZL to 0.0659154 USD, which is 11% lower from the exchange rate around the initial offer due date. The exchange rate is out of date, and therefore CGS-SSG's local currency offer will not be evaluated against the other offers as it is inaccurate.

AR 560.

Based on that analysis, the contracting officer did not convert CGS-SSG's SZL total ceiling price into USD. Instead, the contracting officer computed an evaluated price reflecting CGS-SSG's total ceiling price as expressed in USD, not including VAT and DBA, with a 10 percent reduction for the United States price preference. AR 559.

CGS-SSG's sole competitor at the final stage of DoS review was an Eswatini-based firm, Max Enterprise t/a Buffalo Soldiers ("Max Enterprise"). AR 570. Max Enterprise's final proposal included fully completed Exhibits S and M with all required pricing solely in SZL. *See generally* AR 517–23. The contracting officer converted Max Enterprise's SZL proposal into USD using the exchange rate applicable as of September 30, as FAR 52.225-17(b)(2) required, and reached an evaluated price lower than CGS-SSG's. AR 559, 519–23.

Because Max Enterprise's evaluated price was lower than CGS-SSG's, Max Enterprise was awarded the contract. AR 571. But the parties agree that if the contracting officer had compared the two offers' SZL figures, or converted CGS-SSG's total ceiling price expressed in SZL on its revised Exhibit S into dollars using the same rate applied to Max Enterprise, CGS-SSG would have had the lower evaluated price.

After a debriefing explaining the DoS decision, *see* AR 575–79; *see also* AR 437 § L.8, CGS-SSG filed a timely protest with the Government Accountability Office on December 8, AR 580, and a supplemental protest on January 18 of this year, AR 613, both of which were denied. AR 634. The current protest follows.

## DISCUSSION

### I. Legal Standards

#### A. Jurisdiction and Standing

To reach the merits of the case, I must first determine that the Court has jurisdiction over CGS-SSG's claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). This Court's jurisdiction in post-award bid protests is derived from the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996,

Pub. L. No. 104-320, § 12(a)–(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)); *see Dyonyx, L.P. v. United States*, 83 Fed. Cl. 460, 464–65 (2008). The Tucker Act now grants this Court jurisdiction "to render judgment on an action by an interested party objecting to … the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). This Court is empowered under the statute to "award any relief that the court considers proper, including declaratory and injunctive relief[.]" 28 U.S.C. § 1491(b)(2).

"[S]tanding is a threshold jurisdictional issue," *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002), and "[o]nly an 'interested party' has standing to challenge a contract award." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). The Federal Circuit has developed a two-part test for "interested party," requiring that a plaintiff show it (1) is an "actual or prospective bidder," and (2) "possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing *Myers Investigative*, 275 F.3d at 1369 (itself citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))).

Here, it is straightforward that Plaintiff meets the two-part test and thus qualifies for standing. First, CGS-SSG was an "actual bidder" who submitted a proposal. AR 539–43. Second, the parties agree that under CGS-SSG's preferred interpretation of the relevant FAR provision, CGS-SSG would have been awarded the contract. It therefore possesses the necessary economic interest.

## B. Standard of Review

This Court reviews bid protests "pursuant to the standards set forth in section 706 of title 5," *i.e.*, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). There are two bases for setting aside government procurements: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000).[5]

The first route involves determining "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332–33 (quotes omitted) (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To succeed in that way, "the disappointed bidder

---

[5] A protestor must also demonstrate that it was prejudiced by the agency's conduct. *Bannum*, 404 F.3d at 1351.

bears a heavy burden of showing that the award decision had no rational basis." *Id.* (quotes omitted) (citing *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).

The second route requires the disappointed bidder to "show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quotes omitted). This Court has denied relief where the violation is not "clear," but merely "colorable." *FirstLine Transp. Sec. v. United States*, 107 Fed. Cl. 189, 205 (2012).

In either case, review is "highly deferential" to agency decision-making, *id.* at 196 (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)) — especially in a negotiated procurement like this one, where "the contracting officer is entrusted with a relatively high degree of discretion." *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)); *see also McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 229 (2016).[6]

## II. Merits

The question is whether the contracting officer acted irrationally or in clear violation of law by comparing CGS-SSG's USD figures with Max Enterprise's SZL offer, as converted to USD at the September 30 exchange rate. CGS-SSG argues — from several different angles — that the contracting officer should have relied on its SZL figures instead. I conclude CGS-SSG's arguments do not meet the standard for overturning the contracting officer's decision.

As CGS-SSG acknowledges, the contracting officer reasonably perceived that CGS-SSG's offer contained two distinct sets of prices in USD and SZL. *See* AR 559, 568; *see also* Tr. at 23–24. The contracting officer recognized that the two sets were connected by an exchange rate that no longer applied. AR 560. But the RFP prohibited "alternate offer[s]," AR 436 § L.3, and "[a]lternative pricing strategies," AR 449 § M.2.1, so the contracting officer could not interpret the prices as distinct alternatives without disqualifying the offer. Rather, he had to assume that one set of figures controlled, and that the other was only an outdated illustration.

---

[6] Other courts apply a similar level of deference. *See, e.g.*, *Latecoere Int'l*, 19 F.3d at 1356 ("This deferential standard reflects the respect that reviewing courts are required to accord to agencies in their evaluation of bids and in their interpretation and application of procurement regulations."); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 (5th Cir. 1978) (listing "considerations of price" among the areas in which contracting officers are entitled to exercise discretion) (quoting *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 869 n. 10 (D.C. Cir. 1970)); *see also Patriot Contract Servs., LLC v. United States*, 388 F. Supp. 2d 1010, 1019 (N.D. Cal. 2005).

That left the contracting officer with two choices. First, he might (as he did) assume that CGS-SSG's SZL figures were purely illustrative, and instead compare CGS-SSG's USD offer with Max Enterprise's offer. Because that meant there were "offers in more than one currency," FAR 52.225-17 then required that the contracting officer convert Max Enterprise's offer from SZL to USD with the September 30 exchange rate, yielding a lower USD price than CGS-SSG's. Second, he might (as CGS-SSG proposes) assume that CGS-SSG's *USD* figures were illustrative, and directly compare CGS-SSG's SZL offer with Max Enterprise's SZL offer. The contracting officer could then have disregarded FAR 52.225-17, for the contracting officer would only have needed to compare two local currency offers against each other.[7] Tr. at 14. Either way, the contracting officer would have had to treat one of the currencies mentioned in CGS-SSG's proposal as overriding the other — or else, again, the proposal would have had alternative prices.

So was it rational and consistent with the law for the contracting officer to treat the USD offer as the controlling one? Each iteration of Exhibit S in CGS-SSG's proposal included unit rates in USD alone, AR 21–26, 468–72, 512–16, 539–43, so only the USD offer was complete. AR 449 § M.2.1 ("Proposals that [did] not include rates/prices for all line items … [could] be rejected."). When the contracting officer requested more information "[f]or clarity and consistency" to support what he took to be a "USD offer," AR 335, CGS-SSG never corrected him. The Exhibit S revisions providing prices in both currencies at a given exchange rate do not unambiguously indicate whether the USD figures were derived from SZL, or vice-versa. The contracting officer therefore seems to have rationally concluded that the SZL figures were not a "substantiated" offer but only an illustration at an outdated rate. AR 560.

CGS-SSG claims that it should have been evident to the contracting officer that the proposal was "built up" solely in SZL, with USD provided for the sake of convenience. Plaintiff appears to suggest, for example, that because SZL would have been the medium of exchange for determining costs in Eswatini, as detailed in Exhibit M, the USD unit rates on Exhibit S would have had to originate in SZL. Tr. at 42–43. CGS-SSG's last proposal revision presented Exhibit M first in SZL, then in USD, with only the latter accompanied by the exchange rate. *See* AR 532–33.

The point is certainly reasonable. The ceiling price the contracting officer was required to review had to be in Exhibit S, though — not in Exhibit M — and CGS-

---

[7] The contracting officer could also have converted both proposals' SZL figures into USD at the same exchange rate on the theory that CGS-SSG had made "offers in more than one currency" under FAR 52.225-17. *See* FAR 25.1002(b). That would not have affected the result in this case. To my knowledge (and the parties'), this is the first decision interpreting FAR 52.225-17, and there is no reason to consider whether such a conversion would have been called for.

SSG originally presented its ceiling price in USD only. If CGS-SSG intended the SZL pricing in later versions of Exhibit S to control, which would in effect have changed the proposal from a USD offer to an SZL offer, the firm never made it explicit. The contracting officer could thus have reasonably assumed that the offer was still in USD.

Nor was it evident that CGS-SSG's USD pricing all originated in SZL. CGS-SSG is a joint venture that qualified as a "U.S. firm," so it would have been reasonable for the contracting officer to assume that at least *some* of its overhead costs were calculated initially (or even exclusively) in USD. Indeed, at least two portions of the proposal seem to show just that. First, the proposal describes "teams *sent from the U.S.* to inspect operations and ensure contract compliance" as part of overhead. *See* AR 534 (emphasis added). Second, a table listing the basis of estimates for each "Other Direct Cost" line item — covering expenses like vehicles and guard equipment — is provided only in USD. *Id.*

The record, in short, does not compel the conclusion that CGS-SSG built its offer in SZL alone. That means the contracting officer could rationally have determined that the USD figures controlled, and that it was not appropriate to apply FAR 52.225-17 to convert the SZL pricing. The Court therefore cannot overturn the contracting officer's comparison of CGS-SSG's pricing to Max Enterprise's in SZL.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**, and Defendant's cross-motion is **GRANTED**. The case is **DISMISSED**.

Pursuant to the Court's April 5, 2022 Protective Order (ECF 10), this Opinion has been issued under seal. The transcript of the June 9, 2022 hearing is under seal as well. The parties shall have two weeks to propose redactions and, accordingly, shall file notice of their proposed redactions no later than August 1, 2022. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed. Pursuant to paragraph 12 of the Protective Order, the parties are further ordered to file redacted versions of the administrative record, Plaintiff's Motion for Judgment on the

Administrative Record, and Plaintiff's Response and Reply no later than August 1, 2022.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Stephen S. Schwartz  
STEPHEN S. SCHWARTZ  
Judge